# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
### WESTERN DIVISION

|  |  |  |
|---|---|---|
| KENYA J. BRYANT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| Vs. | ) | Civil Action No.:_____ |
| | ) | JURY TRIAL DEMANDED |
| BAYER CORPORATION; BAYER | ) | |
| HEALTHCARE, LLC; BAYER ESSURE, | ) | |
| INC. f/k/a CONCETPUS, INC.; BAYER | ) | |
| HEALTHCARE PHARMACEUTICALS, | ) | |
| INC., | ) | |
| | ) | |
| Defendants. | ) | |

---

## ORIGINAL COMPLAINT FOR DAMAGES

---

Plaintiff, Kenya J. Bryant, ("Plaintiff") for her Complaint against Defendants, would state unto this Honorable Court as follows:

### JURISDICTION, VENUE AND PARTIES

1. Plaintiff is an individual who resides in Desoto County, Mississippi.

2. Defendant Bayer Corporation, is a foreign corporation with its principal place of business located at 100 Bayer Road, Bldg 4, Pittsburgh, Pennsylvania 15205-9741.  It may be served through its registered agent for service of process at Corporation Service Company, 2908 Poston Avenue, Nashville, Tennessee 37203-1312.  Defendant Bayer Corporation conducts business in this jurisdiction.  Defendant Bayer Healthcare, LLC, is a foreign corporation with its principal place of business located at 100 Bayer Blvd,

Whippany, New Jersey 07981-1544. Defendant Bayer Healthcare, LLC, conducts business in this jurisdiction. It may be served through its registered agent for service of process at Corporation Service Company, 2908 Poston Avenue, Nashville, Tennessee 37203-1312. Defendant Bayer Essure, Inc, formerly known as Conceptus, Inc, is a Deleware corporation with its principal place of business located at 331 East Evelyn Avenue, Mountain View, California 94041. Defendant Bayer Essure, Inc., formerly known as Conceptus, Inc., conducts business in this jurisdiction currently, and at all times relevant, as described in the Complaint. It may be served through its registered agent for service of process at Corporate Service Company, 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808. Defendant Bayer Healthcare Pharmaceuticals, Inc., is a foreign corporation with its principal place of business located at 100 Bayer Blvd, Whippany, New Jersey 07981-1544. It may be served with process through its registered agent for service of process at Corporation Service Company, 2908 Poston Avenue, Nashville, Tennessee 37203-1312. Upon information and belief, Defendant, Bayer Essure, Inc. f/k/a Conceptus, Inc., is a wholly owned subsidiary of, and/or operated by, Bayer Corporation, Bayer Healthcare, LLC, or Bayer Healthcare Pharmaceuticals, Inc.

3. Subject matter jurisdiction of this Court over this action exists under 28 U.S.C. § 1331 based upon Plaintiff's claims of race, sex, and retaliation discrimination under the laws of the United States of America, in particular, Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e, as amended by §1981a (hereinafter, "Title VII"), 42 U.S.C. § 1981, 1983, and 1988. This action is also brought pursuant to the Americans with Disabilities Act, 42 U.S.C. 12101 *et. seq*, as amended.

4. This Court has supplemental jurisdiction over all state law claims alleged in this Complaint under 28 U.S.C § 1367 as there is a common nucleus of operative facts between Plaintiff's state and federal law claims.

5. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) inasmuch as a substantial portion of the events, acts, and omissions giving rise to Plaintiff's causes of action occurred in the Western District of Tennessee, Plaintiff's sales territories with Defendants included the Western District of Tennessee, and since Defendants do business in the Western District of Tennessee.

## ADMINISTRATIVE PROCEDURES

6. Plaintiff timely filed charges and amended charges of race discrimination, sex discrimination, retaliation, pay discrepancy, and wrongful termination/discharge with the Equal Opportunity Commission and the Tennessee Human Rights Commission. Plaintiff received a Notice[s] of Right to File a Civil Action and is filing this suit within 90 days of receiving such notice. Said Notices are attached as Exhibit 1 to Plaintiff's Complaint.

## FACTS

7. This case arises of out Plaintiff's employment with Bayer Essure Inc., f/k/a Conceptus, Inc., and which was subsequently purchased and or/merged with Bayer Corporation, Bayer Healthcare, LLC, which purchased Conceptus, Inc. in 2013, and who now operates Conceptus, Inc. as a wholly-owned subsidiary of Bayer Healthcare, LLC. For purposes of this Complaint, Conceptus, Inc., and Bayer Essure, Inc., are one and the same, and may be referred to interchangeably throughout.

8. At or near the end of June 2011, Plaintiff, an African-American female, was hired by Conceptus, Inc, as a Regional Medical Sales Representative for the Memphis South

territory.   Prior to being hired by Conceptus, Inc., Plaintiff was a successful Pharmaceutical Sales Representative in the Memphis, Tennessee, area, and was actively recruited by Conceptus.

9. Soon after completion of her training with Conceptus, Plaintiff began her position as a Regional Medical Sales Representative selling Essure contraceptive-implantation devices to physicians and hospitals in Tennessee and Missouri.

10. Plaintiff's job duties included, but were not limited to, sales of the Essure® contraceptive device, instructing physicians of Essure's benefit[s] in preventing unwanted pregnancies, assisting in training of physicians performing procedures with the Essure device, and maintaining good business relationships with physicians and hospitals who were clients.

11. During her employment with Conceptus in 2011 and 2012, Plaintiff was subjected to racially derogatory language, racial stereotyping, and racial epithets and comments made in her presence by her immediate Manager Cliff Spann.   Plaintiff was also subjected to derogatory language and comments directed towards women by Mr. Spann during this time on numerous occasions.

12. Also during this time frame, Plaintiff told Mr. Spann that she knew some strong African-American representatives, and could recommend several persons of color, like herself, to Mr. Spann since the company was not diverse.   In response, Mr. Spann stated that "black people aren't qualified" for employment with the company.   Naturally, Plaintiff took this statement to include her not being qualified as well.

13. Further, Plaintiff asked to be given all of the Memphis territory prior to it being divided into two territories.   Plaintiff was informed that she would not be given this sales territory, as Mr. Spann had already made up his mind to hire a white male for the position

(Memphis North).  Plaintiff was informed by Mr. Spann that a black person would not be suitable for this position.

14. Plaintiff complained to management about the racially and sexist derogatory comments of her immediate supervisor, but received no response to same, other than that "Mr. Spann did not mean any of it."  Mr. Spann was eventually realigned to another state during a national company-wide realignment of the field force and managers, and Plaintiff received a new Regional Manager Todd Winter.

15. After Mr. Winter became Plaintiff's immediate superior, Plaintiff was denied personal time off, while other white employees were approved for vacation time without incident or question.

16. In July of 2012, Plaintiff was given an unfair performance review in comparison to other newly-hired representatives in the position of sales representative, who, upon information and belief were all-white.  These representatives were not assessed or reviewed after being with the Company for such a short time.

17. Also in July 2012, Plaintiff attended a regional sales meeting at the Sheraton Hotel in Dallas, Texas.  During the sales meeting, Plaintiff and her colleagues were shown the infamous Allen Iverson "practice" video during the meeting's general session.  After said video was shown, multiple white male sales representatives made derogatory and racially insensitive comments in Plaintiff's presence.  Plaintiff was told by colleagues not to worry about the racially insensitive comments due to "her not sounding black and ghetto" in her dialect unlike Allen Iverson.  The said comments were hostile and offensive to Plaintiff and caused her grief, anxiety, and emotional anguish and further caused her to feel like she was an "unwanted" employee of the company.

18. Additionally, later in 2012, Mr. Winter assigned assistants for all sales representatives to help in their duties in covering their respective sales territories, but Plaintiff was not given any assistance, even upon specific request.  All of the other sales representatives who were given assistants were white.

19. In the fall and winter of 2012, Plaintiff was subjected to racially derogatory comments and gender derogatory comments by Mr. Winter.  Specifically, Mr. Winter asked Plaintiff how she could manage her sales territory and her children as a female after her then-husband had taken a college football coaching job outside the Memphis Metro area.  Further, Mr. Winter made several comments to Plaintiff regarding surprise to her level of education and stated that "Plaintiff was articulate for a black person" and "smarter than most black people."  The callous and indifferent language from Mr. Winter were hostile and offensive to Plaintiff and caused her grief, anxiety, and emotional anguish, and further caused her to feel like she was an "unwanted" employee of the company due to race and sex.

20. Plaintiff's exceeded sales quotas for the year 2012.  In fact, Plaintiff was one of only 2 sales representatives in her region that met or exceeded sales quotas and sales performance.

21. Despite posting excellent sales numbers and exponential growth in her territory, much of Plaintiff's sales territory was stripped from her in January 2013 and given to a white female based in Nashville, Tennessee.  Plaintiff was given a sales territory that did not contain viable accounts like her prior territory.  In fact, Plaintiff's new territory was predominantly poor, penetrated, heavily dependent on Medicaid, and only had a few large accounts unlike her previous territory.

22. Even though Plaintiff had outperformed white colleagues in 2012, she was effectively "demoted" to a sales territory that was guaranteed to produce less income in favor of white employees. One of Plaintiff's white co-workers, Meaghan McCreery, confirmed that a large part of the territory given to Plaintiff, which had been part of McCreery's territory, was effectively non-productive and worthless.

23. Throughout January 2013, Plaintiff attempted to inform her superiors of the unfairness of the sales territorial redistribution and potential impact on her and company sales and growth. Plaintiff's concerns were not responded to by her superiors in any way.

24. On or about January 23, 2013, Plaintiff was attending a national sales meeting in Arizona. During an after dinner social at the hotel where the meeting was being conducted, Plaintiff learned that she earned less income than white male sales representatives, who were her direct counterparts and similarly situated in all respects to Plaintiff, except for being outside of Plaintiff's protected classes, namely African-American and female.

25. The very next day, Plaintiff complained to her direct Manager Todd Winter of the disparate treatment in pay due to her sex and race and felt that she was being discriminated against in this respect as well, in conjunction with the long history of racially derogatory language directed towards her and insensitive gender comments. Plaintiff was informed by her manager that nothing would be done about pay discrepancies between her, a member of two protected classes, and white males, and that if she did not like the situation, she "could leave the company." These statements were intentional and discriminatory in nature, and caused Plaintiff grief, stress, anxiety and left her feeling worthless to the company.

26. Approximately one week after complaining of the above-referenced discrimination to her direct manager, Plaintiff was given an unrealistic and unattainable sales quota and forecast despite the limitations of the new sales territory given her.  This was done in retaliation for Plaintiff complaining about being discriminated against in her workplace.

27. Despite this   shocking development, by February 19, 2013, Plaintiff developed a territorial analysis and sent the same to her manager and her Area Director Sham Shiblaq showing the unrealistic expectations and unattainable sales quotas, and requested a meeting regarding assistance in the development of revenue generating accounts.

28. Plaintiff's requests for a meeting to review the territorial analysis were ignored by her manager and area director, even after Plaintiff was promised a meeting regarding her concerns of discrimination and retaliation, and she had created additional territorial analyses.  Such actions were discriminatory and retaliatory in nature.

29. On or about April 9, 2013, Plaintiff voiced her concerns again to her manager Todd Winter about her territory redistribution and sales quota forecast being unrealistic.  Mr. Winter failed to engage Plaintiff in any meaningful conversation regarding her concerns. Mr. Winter's comment to Plaintiff regarding her concerns was limited to the statement that "he would leave the company if he wasn't making any money."  This statement was intentional and discriminatory in nature, retaliatory in nature, and caused Plaintiff grief, stress, anxiety and left her feeling worthless to the company yet again.

30. At the beginning of June 2013, Plaintiff had submitted another territorial analysis to her manager Todd Winter.  Approximately one day thereafter, Mr. Winter informed Plaintiff she would be receiving a performance reprimand.  Plaintiff expressed to Mr. Winter that none of her peers outside of her protected classes were being subjected to the same

treatment , and expressed her concerns to him that this was a punitive, discriminatory, and retaliatory action.   Mr. Winter's response to Plaintiff was retaliatory and discriminatory in that he stated that Plaintiff "had backed him into a corner."   This statement was intentional and discriminatory in nature, retaliatory in nature, and caused Plaintiff grief, stress, and further anxiety for expressing her concerns regarding discrimination in her workplace.

31. On or about June 5, 2013, Bayer Corporation and/or Bayer Healthcare, LLC, acquired Conceptus, Inc.

32. On or about June 7, 2013, Plaintiff emailed her superiors informing them that she felt that she was being targeted, penalized, and pushed out by the company due to her complaints of discrimination.

33. On or about June 18, 2013, Plaintiff, during a meeting with Mr. Winter and Vice-President of Sales, Sarah Huber, was verbally harassed, intimidated and yelled at for purported performance-based reasons.   At no time during this meeting was Plaintiff allowed to present any revenue-generating relationships or discuss the same with Mr. Winter and Ms. Huber, even after being specifically requested to prepare the above-mentioned territorial analyses, and after requesting that they meet in a good-faith exercise to address her concerns of her territory.   This meeting caused Plaintiff grief, stress, and further anxiety for expressing her concerns regarding discrimination in her workplace.

34. On July 10, 2013 while at a Bayer National Sales Meeting in Dallas, Texas, Plaintiff met with Marilyn Hundley, HR Director of Bayer's Women's Health Care and Kevin McManus, Vice-President of Human Resources regarding her previously-filed complaint with Conceptus, and informed them of the race, gender, and sex discrimination she had

endured, and the retaliatory actions of her superiors.  Plaintiff was later pulled out of a meeting and informed that Mr. Winter and Ms. Huber were not to retaliate further against her.  However, no actions were taken, and Plaintiff had to work under the direct supervision of Mr. Winter and his Manager/Vice President of Sales, Sarah Huber, for approximately four additional months.

35. In October of 2013, there was nationwide restructuring of Bayer sales management. Plaintiff was officially transitioned away from Mr. Winter and Ms. Huber to Bridget Bonnie-Smith as her Regional Business Manager and Michael Oakley, Area Business Director.

36. On November 20, 2013, Bayer Human Resources officials finally responded to Plaintiff's claims of discrimination based upon race, sex and retaliation by holding a conference call with Plaintiff.  However, Bayer informed Plaintiff that no action[s] would be taken upon her allegations of discrimination and retaliation.  However, Plaintiff was assured that no additional discrimination or retaliatory actions would be taken against her.

37. The very next day, Plaintiff met with Bridget Bonnie-Smith and Michael Oakley, her new managers.  During this meeting, the Bayer managers consistently threatened Plaintiff with termination only one day after her conference call with Bayer Human Resources. This meeting was intentional and discriminatory in nature, retaliatory in nature, and caused Plaintiff grief, stress, anxiety.  To Plaintiff's belief, she was singled out for said meeting based upon her race, sex, and prior complaints of discriminatory conduct.

38. Plaintiff filed a charge of discrimination with the EEOC on November 22, 2013.  This charge was later amended by Plaintiff, and Plaintiff filed additional charges of discrimination.

39. Over the remainder of 2013, Plaintiff continued to report additional retaliatory actions taken against her by her supervisors to Bayer management regarding her territorial reassignment and unattainable sales quotas that were placed upon her after reporting racial and gender-based discrimination. However, no response to her reports were ever forthcoming, which further contributed to Plaintiff's stress, anxiety, humiliation and mental anguish.

40. On January 6-9, 2014, Plaintiff attended the Bayer National Sales Meeting in Orlando, Florida. Due to the discrimination she had suffered at Conceptus and Bayer, prior to the commencement of said meeting, Plaintiff suffered from a panic attack, hypertension, and migraine headaches. During this event she also encountered Cliff Spann and Todd Winter, two Bayer managers that had discriminated against her due to her race and sex. After her encounter with Mr. Spann Plaintiff suffered a panic attack. After her encounter with Mr. Winter, Plaintiff also suffered a panic attack.

41. Later that month, Plaintiff received a base pay increase from Bayer, however similarly situated white sales representatives received higher base salaries than Plaintiff.

42. In the spring of 2014, Plaintiff received several positive performance reviews from her superiors.

43. On April 24, 2014, Plaintiff participated in an EEOC mediation with Bayer. Subsequent to this mediation, Plaintiff suffered from debilitating insomnia, hypertension, anxiety, stress, and migraine headaches.

44. On or about May 13, 2014, Plaintiff received communications from her superiors regarding a meeting to discuss her performance, despite her previous positive

performance reviews.    Due to this unfounded request to review her performance, Plaintiff underwent another major panic attack, stress, grief, and anxiety.

45. Due to the unfounded request to review Plaintiff's performance, and subsequent medical emergency endured by Plaintiff, Plaintiff was forced to take FMLA leave from Bayer.

46. The next day, May 14, 2014, the Plaintiff was diagnosed by physicians with having disabilities recognized under the Americans with Disabilities Act.

47. Plaintiff was approved for FMLA leave from May 13, 2014 through August 5, 2014.

48. During Plaintiff's leave of absence, Plaintiff's territory was covered by a white male sales representative, Michael Garlock.

49. After assuming Plaintiff's territory, Mr. Garlock disseminated false and defamatory statements to Plaintiff's customers.   Mr. Garlock also informed Plaintiff's customers about her medical issues and complaints to human resources about workplace discrimination, and told them that the Plaintiff was going to be fired.   Mr. Garlock's comments were relayed to Plaintiff by a client/customer of Plaintiff.   Upon learning of Mr. Garlock's comments, Plaintiff suffered severe emotional grief and anguish, stress and anxiety.

50. Plaintiff was physically cleared to return to work for Bayer on August 5, 2014, with two restrictions requested by her physician.   Plaintiff's return to work was denied by Bayer.

51. On or about August 6, 2014, Plaintiff requested reasonable accommodations under the ADA to perform her position with Bayer.   Said accommodations did not place undue hardship on Bayer in any fashion.   Said accommodations were denied and Plaintiff was placed on an involuntary leave of absence.

52. On or about September 9, 2014, Plaintiff's Memphis territory (#C058268) was taken away from her and assigned to white male sales representative, Michael Garlock. On or about this same date, Plaintiff was given a non-comparable territory which constituted much longer driving distances and less lucrative accounts than her previous territory.

53. This territorial redistribution/reassignment in September 2014 was discriminatory and retaliatory in nature in that one of Plaintiff's requested reasonable accommodations was the limitation of consecutive travel time of more than three hours.

54. Throughout the fall of 2014, Plaintiff stayed in contact with Bayer providing them information about her medical condition[s], her ability to perform the essential functions of her job, and re-iterated her request for reasonable accommodations to perform her job.

55. On or about November 25, 2014, Plaintiff's request for reasonable accommodations was denied again by Bayer, and Plaintiff was given two-weeks to find another position with Bayer or be terminated.

56. This termination threat was later rescinded, but Plaintiff was later informed on January 23, 2015 that she would be terminated in two weeks if she did not find alternative employment with Bayer.

57. On or about February 6, 2015 Plaintiff was terminated by Bayer due to her protected disabilities and even though she could perform the essential functions of a sales representative of Bayer.

58. Due to Defendants' failure to reasonably accommodate Plaintiff's injuries due to the discrimination she had suffered for years, Plaintiff suffered severe emotional grief and anguish, stress and anxiety.

## NATURE OF THE ACTION AND RELIEF SOUGHT

59. This is an employment discrimination and retaliation case against the Defendants alleging a continuing series of discriminatory acts against Plaintiff. These acts include, but are not limited to: (a) retaliation for being a known and outspoken witness to discriminatory acts, and the subject of discriminatory acts, imputable to the Defendants, of racially-based and gender-based discrimination in her workplace, and harassment of Plaintiff in retaliation for complaints of race, sex, and disability discrimination to Defendants and their supervisory personnel; (b) sex discrimination for being treated less favorably than similarly situated male employees in the terms and conditions of her employment with Defendants; (c) race discrimination for being treated less favorably than similarly situated white employees in the terms and conditions of her employment, adverse employment actions based upon Plaintiff's race, and the continued use of racially-charged and derogatory language in her presence, and directed towards Plaintiff; (d) disability discrimination for being disabled or "regarded as" disabled under the ADA and not being returned to work after repeated requests to return to work with Defendants with reasonable accommodations that did not pose an undue hardship to Defendants; (e) retaliation by Defendants for making significant changes in her employment status, such as termination, failing to promote, harassment, demotion, reassignment with significantly different sales territories, reassignment with significantly different job responsibilities, reassignment with less-lucrative sales territories, continued employment under adverse working conditions and loss of benefits; (f) discrimination in pay based upon her sex and race.

60. At all times relevant, Defendants had anti-discriminatory policies in place, however, they failed to abide by same, resulting in adverse employment actions taken against Plaintiff,

including, but not limited to the allegations set forth in numbered paragraph 59 of Plaintiff's Complaint.

## CAUSES OF ACTION

### COUNT I:
### VIOLATIONS OF 42 U.S.C. §2000e-2(a)(1)

61. Plaintiff re-alleges and incorporates by reference the allegations set forth in all preceding paragraphs as if set forth fully and reiterated here in their entirety.

62. The acts and failures to acts of Defendants, who are statutorily defined employers under Title VII of the Civil Rights Act of 1964, by and through its supervisory agents, workmen, agents and employees constituted and unlawful employment practice in that they discriminated against the Plaintiff with respect to the terms and conditions of her employment because of her race and sex. As enumerated above, Defendants discriminated against Plaintiff over a continued period of time regarding work assignments and sales territories due to her race and sex. Similarly situated white employees were not subjected to the same adverse employment actions and assignments. Defendants discriminated against Plaintiff due to her race and sex in her pay with respect to white males and females.

63. Defendants are strictly liable for the acts and failures to act of its employees and supervisory personnel who treated Plaintiff less favorably than white employees and less favorably than male employees.

64. The acts and failures to act of Defendants constituted unlawful employment practices proscribed by 42 U.S.C. §2000e-2(a)(1).

### COUNT II:
### VIOLATIONS OF 42 U.S.C. §2000e-2(a)(2)

65. Plaintiff re-alleges and incorporates by reference the allegations set forth in all preceding paragraphs as if set forth fully and reiterated here in their entirety.

66. The acts and failures to act of Defendants  by and through its supervisory agents, workmen, agents and employees, constituted an unlawful employment practice in that Defendants tended to limit, segregate and classify the Plaintiff in such a way as to deprive her of employment opportunities, or otherwise adversely affect her status as an employee because of her race and sex, and in retaliation for reporting racial and gender discriminatory practices of Defendants throughout her tenure of employment with Defendants, and participating in the investigation of race and sex discrimination that she complained of.

67. As stated above, whenever Plaintiff would complain of race or sex-based discriminatory practices by Defendants, Plaintiff would be subjected to retaliatory or punitive actions by Defendants which adversely affected her employment with Defendants, and affected the terms and conditions of her employment with Defendants.

68. Defendants are strictly liable for the acts and failure to act of its supervisory personnel and employees.

69. Defendants' acts and failures to act constituted unlawful and adverse employment actions that are proscribed by 42 U.S.C. § 2000(e)2(a)(2).

**COUNT III:**
**VIOLATIONS OF 42 U.S.C. §2000e-3(a)**

70. Plaintiff re-alleges and incorporates by reference the allegations set forth in all preceding paragraphs as if set forth fully and reiterated here in their entirety.

71. Throughout the course of her employment with Defendants, and prior to her termination by Defendants, Plaintiff was treated unfairly and discriminated against on the basis of her race, African-American, and gender, female, and subjected to an overall hostile work environment.

72. Plaintiff complained of race or sex-based discriminatory practices by Defendants on an ongoing basis. Plaintiff's supervisors and Defendants employees effectively ignored her complaints which subsequently led to her termination and firing.

73. Plaintiff complained of the use of racially derogatory language by supervisory personnel of Defendants on multiple occasions, which was also ignored.

74. As stated above in multiple allegations, whenever Plaintiff complained of specific race or gender discrimination practices of Defendants and its employees, Plaintiff was subjected to retaliatory or punitive actions by Defendants which adversely affected her employment with Defendants, and affected the terms and conditions of her employment with Defendants.

75. This retaliatory conduct of Defendants continued throughout her employment with Defendants, culminating in her termination. Said retaliatory conduct was ongoing throughout Plaintiff's employment with Defendants, and was not isolated to one discrete event. Defendants even retaliated against Plaintiff in attempting to exercise her right's under worker's compensation laws.

76. This retaliatory conduct of Defendants constituted racial and sexual discrimination and was punitive and retaliatory in nature each and every time Plaintiff exercised her rights and complained of discriminatory conduct. The reporting and complaining of

discriminatory conduct is a protected right and Defendants repeatedly retaliated against Plaintiff for exercising her rights.

77. Said actions on the part of the Defendants were the direct and proximate cause of Plaintiff to suffer damages, including, but not limited to, lost wages and benefits, back pay, front pay, past and future benefits, loss of earning capacity, shame, humiliation, damage to reputation, physical and psychological injury, emotional distress, anxiety, and inability to enjoy life's pleasures and activities.

## COUNT IV:
## VIOLATIONS OF PLAINTIFF'S RIGHTS PURSUANT TO 42 U.S.C §1981

78. Plaintiff re-alleges and incorporates by reference the allegations set forth in all preceding paragraphs as if set forth fully and reiterated here in their entirety.

79. The acts and failures to act of the Defendants as described herein above based upon Plaintiff's race, were intended to, and did deprive Plaintiff of her protected rights as outlined in 42 U.S.C. §1981, and equal protections of the laws guaranteed her by the Fourteenth Amendment to the Unites States Constitution.

80. The acts of retaliation of the Defendants as described herein above based upon Plaintiff's race, were intended to, and did deprive Plaintiff of her protected rights as outlined in 42 U.S.C. §1981, and equal protections of the laws guaranteed her by the Fourteenth Amendment to the Unites States Constitution.

81. The acts and failure to act of the Defendants were proscribed by 42 U.S.C. §1981 which are to protect Plaintiff from employment discrimination based upon her race, which the Defendants violated when they treated the Plaintiff less favorably than similarly situated white persons.

## COUNT V:
**VIOLATIONS OF THE AMERICANS WITH DISABILITIES ACT, as amended, 42 U.SC. § 12111** *et. seq.* **and TITLE V Section 503 of the Act, 42. U.S.C. 12203**

82. Plaintiff re-alleges and incorporates by reference the allegations set forth in all preceding paragraphs as if set forth fully and reiterated here in their entirety.

83. At all times relevant, Defendants were employers within the meaning of the Americans with Disabilities Act (ADA), as amended.

84. Plaintiff is an individual with a disability as defined by the ADA, as amended. Pleading alternatively, Plaintiff was "regarded as" disabled by the Defendants.

85. Plaintiff alleges that the intentional acts and omissions of Defendants as described herein and above constitute violations of the ADA which entitle her to compensatory damages, front pay, back pay, and attorneys' fees and costs.

86. Plaintiff was qualified to perform her position as a regional sales representative for Defendants.

87. Plaintiff requested reasonable accommodations for her disabilities of Post-Traumatic Stress Disorder, Panic Disorder and Major Depressive Disorder. Plaintiff's primary care physician, Dr. Otis Anderson informed Defendants that Plaintiff needed reasonable accommodations due to her medical conditions.

88. Plaintiff's medical conditions were caused by the race and sex-based discrimination previously enumerated in her Complaint.

89. Plaintiff was denied reasonable accommodations as requested.

90. Plaintiff's request for reasonable accommodations did not constitute an undue hardship on Defendants.

91. Further, after attempting to exercise her protected rights under the ADA, Plaintiff was retaliated against by Defendants by requesting reasonable accommodations in that her sales territory was taken away from her, and she was given a much larger and less-lucrative territory than she previously had. This was intentional and punitive in nature, as one of the reasonable accommodations Plaintiff had requested was a limitation of continuous travel time by Plaintiff.

92. As a direct and proximate result of Defendants' violations of the Americans with Disabilities Acts, Plaintiff has suffered and continues to suffer loss of income, loss of past and future employment benefits, loss of earning capacity, shame, humiliation, damage to reputation, physical and psychological injury, emotional distress, anxiety, and inability to enjoy life's pleasures and activities.

## COUNT VI:
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

93. Plaintiff re-alleges and incorporates by reference the allegations set forth in all preceding paragraphs as if set forth fully and reiterated here in their entirety.

94. The Defendants' foregoing conduct negligently and carelessly inflicted sever emotional distress upon Plaintiff.

95. Said actions on the part of Defendants caused Plaintiff to suffer damages including, but not limited to, loss of income, loss of past and future employment benefits, loss of earning capacity, shame, humiliation, damage to reputation, physical and psychological injury, severe emotional distress, anxiety, and inability to enjoy life's pleasures and activities.

## COUNT VII:
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

96. Plaintiff re-alleges and incorporates by reference the allegations set forth in all preceding paragraphs as if set forth fully and reiterated here in their entirety.

97. The Defendants' foregoing conduct were extreme and outrageous, were intentional, and caused Plaintiff extreme emotional distress.

98. Said actions on the part of Defendants caused Plaintiff to suffer damages including, but not limited to, loss of income, loss of past and future employment benefits, loss of earning capacity, shame, humiliation, damage to reputation, physical and psychological injury, severe emotional distress, anxiety, and inability to enjoy life's pleasures and activities.

## COUNT VIII:
## ATTORNEYS FEES

99. Plaintiff re-alleges and incorporates by reference the allegations set forth in all preceding paragraphs as if set forth fully and reiterated here in their entirety.

100. As a result of the actions of the Defendants, it was necessary for Plaintiff to employ counsel to conduct this litigation.   Plaintiff is entitled to recover a sum equal to all reasonable attorneys' fees incurred in prosecuting this lawsuit, as well as post-judgment proceedings and appellate proceedings as allowed by federal and state statutes and laws providing for the recovery of attorneys' fees in employment discrimination matters.

## JURY DEMAND

101. Plaintiff requests a trial by jury of the issues of the case.

## PRAYER FOR RELIEF

Wherefore, Premises Considered, Plaintiff prays for the following relief:

1. That proper process issue and be served upon all Defendants and that Defendants be required to Answer within the time prescribed by law;

2. Compensatory damages to include front pay and back pay, the sum to be determined at the time of trial;

3. Attorneys' fees and the costs of this litigation to include expert fees;

4. Damages for shame, humiliation, embarrassment and damages for physical and emotional pain and suffering in the past and which will in all reasonable probability occur in the future;

5. Punitive damages;

6. Attorneys' fees and costs;

7. Pre-judgment and post-judgment interest;

8. Costs of court;

9. All other relief to which Plaintiff may be entitled to in law and equity, or as justice so requires.

Respectfully submitted,

_____/s/ Kenneth O. Cooper_____
M. Dean Norris, (No. 25611)
Kenneth O. Cooper, (No. 20029)
Leitner, Williams, Dooley & Napolitan, PLLC
Brinkley Plaza, Suite 800
80 Monroe Avenue
Memphis, TN 38103
Tele: (901) 527-0214
Dean.Norris@leitnerfirm.com
Ken.Cooper@leitnerfirm.com